IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

MCKESSON CORPORATION                                        PLAINTIFF

V.                              CASE NO. 3:15-CV-03026

C.C. "BUD" GRISHAM; and
THE ESTATE OF MARY FAYE
(BURKE) GRISHAM                                             DEFENDANTS

## MEMORANDUM OPINION

This litigation revolves around a CERCLA superfund site in Omaha, Arkansas, and a related settlement agreement entered into by the parties on New Year's Eve of 1987. From 1962 to 1973, Arkwood, Inc. owned and operated the Arkwood Wood Treating Facility ("Treating Facility"), located on an 18 acre parcel of land in Omaha, Arkansas, owned by Hallie Ormond (the "Site" or the "Arkwood Site"). During this time, Ormond and Bud Grisham were stockholders and officers of Arkwood, Inc., and Grisham was actively involved in the operation of the Treating Facility. In 1973, Mass Merchandisers, Inc. ("MMI") leased the 18-acre parcel from Ormond and took over the operation of the Treating Facility from Arkwood, Inc. MMI ceased its operations at the Treating Facility in 1984. In 1985, MMI became a wholly owned subsidiary of McKesson Corporation ("McKesson"). MMI's lease expired in 1985 and the Treating Facility was dismantled in 1986. At an undetermined point prior to 1987, Mary Burke took title to the Site from Ormond.

In May of 1986, McKesson, MMI, and the United States Environmental Protection Agency ("EPA") executed an agreement whereby McKesson and MMI agreed to

1

undertake a Remedial Investigation / Feasibility Study of the Site. As it turned out, the operation of the Treating Facility had caused various hazardous materials to be released into the environment, including pentachlorophenol, creosote, and dioxin. While substantial progress has been made, the Site is still subject to EPA and Arkansas Department of Environmental Quality ("ADEQ") supervision today.

The EPA's intervention resulted in two lawsuits between McKesson / MMI and a group of individuals known as the Ormond Group, over responsibility and liability for the cleanup. The Ormond Group includes Bud Grisham and Mary (Burke) Grisham. These suits were dismissed on December 31, 1987, when the parties entered into a Settlement Agreement and a Site Agreement. (Doc. 19-1). Pursuant to the Agreements, the Ormond Group paid $200,000.00 to MMI, and in exchange MMI released any claims it may have had against the Ormond Group, with some minor exceptions. The parties also agreed to dismiss their pending claims against each other. As a result of the Agreements, McKesson has incurred the liability for the cleanup, costing it over $20,000,000.00 to date.

One otherwise innocuous clause of the Settlement Agreement has become the centerpiece of the instant litigation. Section 9.2 of that Agreement declares, in pertinent part, that the Ormond Group "shall cooperate with MMI . . . by, among other things . . . not conferring with regulatory agencies . . . without MMI's prior written consent." (Doc. 19-1, p. 11). McKesson alleges that Defendants have repeatedly violated this clause, in breach of the Settlement Agreement, since at least 2010. Specifically, McKesson alleges that Bud Grisham's son, Curt Grisham, has repeatedly conferred with the EPA and the ADEQ without first receiving prior written consent. McKesson further alleges

2

that Curt Grisham has been acting as his father's agent while conferring with the EPA and the ADEQ. According to McKesson, its costs related to the rehabilitation of the site have increased from $11,168.22 annually to $175,837.07 annually over the course of the last five years. It attributes at least $80,000.00 in costs over that time frame to Defendants' alleged breach.

McKesson filed a complaint with this Court on April 22, 2015, and later filed its Amended Complaint on May 22, 2015. The Amended Complaint asserts that Defendants breached the Settlement Agreement and asks the Court to provide declaratory relief as to the effect and enforceability of Section 9.2 of the Settlement Agreement, equitable relief to prevent Defendants from conferring with the regulatory agencies, and at least $80,000.00 in actual damages.

Bud Grisham, acting in his individual capacity,[1] filed an Answer to the Amended Complaint on May 26, 2015. After the Court directed the Estate of Mary Faye (Burke) Grisham (the "Estate") to obtain counsel, it filed its First Amended Answer and Counterclaim on June 29, 2015. The counterclaims allege that McKesson breached the Settlement Agreement in several manners, including by (i) purposefully preventing the Arkwood Site from ever being rehabilitated; (ii) interfering with the Estate's rights in adjacent lands; (iii) violating the duty of good faith and fair dealing; (iv) preventing the Estate from being able to use or sell the land; (v) denying or restricting the Estate from accessing the land; and (vi) using the property to store boats. In addition to requesting damages for McKesson's breach, the Estate asks the Court to declare that Section 9.2

---

[1] Bud Grisham is also the executor of the Estate. McKesson further alleges that he is the sole devisee of the Site, but Grisham contends that the matter is still in probate.

3

of the Settlement Agreement violates public policy, the First Amendment of the United States Constitution, and Article 2 §§ 2, 4, and 6 of the Arkansas Constitution.

McKesson filed a Motion to Dismiss on July 13, 2015, in response to the Estate's First Amended Answer and Counterclaim, arguing that the Estate has failed to state any claim upon which relief can be granted. After that motion was fully briefed, the Estate moved for leave to file its Second Amended Answer and Counterclaim on August 20, 2015. The Second Amended Answer and Counterclaim makes five material changes. It: (i) adds the claims of Nuisance and (ii) Slander of Title; (iii) asserts that Section 9.2 of the Settlement Agreement is unconscionable; (iv) asserts that Section 1(e) of the Site Agreement, prohibiting the Ormond Group from selling the site without MMI's prior written consent, is unconscionable or void as a matter of public policy; and (v) abandons the Estate's constitutional claims. The Estate makes changes to the factual allegations levied against McKesson as well.

These Motions are now ripe for decision. The Court will first address the Estate's Motion to File Second Amended Answer and Counterclaim, and then explain its ruling with regard to McKesson's Motion to Dismiss.

### I.   The Estate's Motion For Leave to Amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure instructs courts to "freely give leave when justice so requires." "A district court can refuse to grant leave to amend a pleading only where it will result in 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'" *Dennis v. Dillard Dep't Stores, Inc.*, 207 F.3d

523, 525 (8th Cir. 2000) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "A court can deny leave to amend as futile where the amended pleading would not survive a motion to dismiss." *Sentell v. RPM Mgmt. Co.*, 653 F. Supp. 2d 917, 919 (E.D. Ark. 2009) (citing *Owen v. General Motors Corp.*, 533 F.3d 913, 921 (8th Cir. 2008)). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a complaint, the Court assumes that "all factual allegations in the pleadings are true and interpret[s] them in the light most favorable to the nonmoving party." *Bell v. Pfizer, Inc.*, 716 F.3d 1087, 1091 (8th Cir. 2013) (internal quotation omitted).

For the reasons detailed below, the Estate's proposed Second Amended Answer and Counterclaim is futile, except as to its claim regarding Section 1(e) of the Site Agreement. Its other proposed additional claims would not survive a motion to dismiss, and the additional facts offered in support of its existing claims would not change the Court's disposition of those claims.

## A. The Estate's Proposed Nuisance Claim is Futile

The Estate's proposed nuisance claim alleges that McKesson unreasonably and wrongfully interfered with its use of its property by preventing the Estate from selling timber on its adjacent lands,[2] thwarting the return of the Site to its beneficial use, and

---

[2] The Estate uses the terms "adjacent," "adjoining," and "additional" to describe the land from which the Estate wanted to harvest timber. While, without context, these terms would seem to indicate that the land is somehow separate from the land owned by the Estate, the filings make clear that the Estate owns all of the land to which it refers. In other words, the "adjacent" lands are adjacent to the Site, but the Estate owns both the Site and the surrounding, adjacent, lands.

preventing the Estate from accessing the property. Arkansas defines nuisance as "conduct by one landowner that unreasonably interferes with the use and enjoyment of the lands of another and includes conduct on property that disturbs the peaceful, quiet, and undisturbed use and enjoyment of nearby property." *Goforth v. Smith*, 338 Ark. 65, 79 (1999). While the Arkansas Supreme Court has apparently not directly addressed the question of whether an action for nuisance can persist when only one parcel of land is involved, federal district courts in Arkansas have rejected the proposition that it can. Both *Patton v. TPI Petroleum, Inc.*, 356 F. Supp. 2d 921 (E.D. Ark. 2005), and *Sewell v. Phillips Petroleum Co.*, 197 F. Supp. 2d 1160 (W.D. Ark. 2002), held that the Arkansas Supreme Court has implicitly defined nuisance to involve two parcels of land, and dismissed claims involving only one parcel accordingly.

Following the leads of *Patton* and *Sewell*, this Court agrees that the Arkansas Supreme Court would be disinclined to "depart from the historic role that the law of private nuisance has played as a means of efficiently resolving conflicts between neighboring, contemporaneous land uses." *Patton*, 356 F. Supp. 2d at 932. Because the instant dispute involves only one parcel of land, this Court would dismiss the Estate's claim on a motion to dismiss. The proposed amendment is, therefore, futile.

## B. The Estate's Proposed Slander of Title Claim is Futile

The Estate's proposed slander of title claim arises from McKesson's alleged inclusion of superfluous restrictions in a deed apparently filed in 2010 as a part of the EPA's remediation plan for the Site. These superfluous restrictions involved the inclusion of twelve additional acres of the Estate's land, and of usage restrictions beyond what the EPA required.

Arkansas defines slander of title as "an action based on malicious publication of a false matter that disparages the title to property." *Harlan v. Bank of Am., N.A.*, 2014 WL 7335547, at *4 (W.D. Ark. Dec. 18, 2014) (quoting *Evans v. JP Morgan Chase Bank, N.A.,* 2014 WL 359226, at *6 (W.D. Ark. Feb. 3, 2014)). This Court has stated that to prevail on a claim of slander of title, a plaintiff must prove "that the defendant acted with malice in making a slanderous statement regarding the title of another's property and the defendant's defamatory statement resulted in special damage to the plaintiff." *Id.*; *see also Hicks v. Earley*, 235 Ark. 251, 254 (1962) ("[I]t is necessary, before appellant can prevail, that he establish that appellees acted with malice.") (citing *Sinclair Refining Co. v. Jones*, 188 Ark. 1075 (1934)).

While McKesson agrees with this standard, (Doc. 48, p. 12), and the Estate does not contest it, upon this Court's further research is does not appear that an Arkansas court has explicitly required special damages to make out a slander of title claim. Instead, only federal courts interpreting Arkansas law have cited this requirement. *See Harlan*, 2014 WL 7335547 at *4; *Evans*, 2014 WL 359226 at *6; *Heuer v. Basin Park Hotel and Resort,* 114 F.Supp. 604, 613 (W.D. Ark. 1953). Nonetheless, the Court finds that the Arkansas Supreme Court would, or implicitly does, require plaintiffs to allege special damages to make out a slander of title claim.

Up until 1998, Arkansas required plaintiffs to prove actual damages in all slander actions *unless* the alleged statement constituted slander *per se*. *E.g.*, *Waymire v. DeHaven*, 313 Ark. 687, 689 (1993). As the Arkansas Supreme Court later explained:

> Under the common law, defamation *per se* encompassed false statements that the plaintiff was guilty of a crime, afflicted with a loathsome disease, as well as false statements prejudicing the plaintiff's ability to engage in his or her profession. In such cases, the plaintiff could recover

> compensatory damages without proof of actual damage to reputation. In
> other words, damages were presumed from the nature of the defamation,
> as defamatory statements *per se* were considered injurious and sufficient
> to support an award of special damages.

*United Ins. Co. of Am. v. Murphy*, 331 Ark. 364, 368-69 (1998) (citations omitted). In

*United*, however, the Arkansas Supreme Court decided to abandon the slander *per se*

doctrine, and require all plaintiffs to prove actual damage to their reputation. *Id.* at 371.

It would be inconsistent with *United* for this Court to now find that a plaintiff alleging

slander of title need not meet the analogous burden of proving that the allegedly

slanderous act caused her to incur actual damage. In the slander of title context, this will

generally, if not always, mean proving pecuniary—*i.e.* special—damages. *See* 103 Am.

Jur. Trials 1 (2007) ("As a general rule, in order to prove special damages, the plaintiff

must establish pecuniary loss suffered as a result of the slander of title.").

Further, the Arkansas slander of title cases reviewed by this Court all included

allegations of special damages. *E.g.*, *Boehm v. Moench*, 1987 WL 18301, at *3 (Ark. Ct.

App. Oct. 14, 1987) (alleging that the slanderous filing of a lawsuit the day prior to the

closing of the sale of a home prevented the sale from going through); *Sinclair*, 188 Ark.

at 1075 (alleging that slandering of title caused appellees' suppliers to stop supplying

him with gas and oil products for re-sale). And, the Court notes that "[i]t is a well-

established principle that general damages are not presumed to result from a slander of

title and, thus, the plaintiff must show that he suffered special damages which

proximately resulted from publication of the disparaging statement or claim." 103 Am.

Jur. Trials 1 (2007). For these reasons the Arkansas Supreme Court would require a

showing of special damages to make out a slander of title claim, if it does not indeed

already so require.

While the facts surrounding how the restrictions came to be included in the deed, who filed the deed, and when, whether, and to what extent the deed was corrected are somewhat murky, even assuming these facts in the light most favorable to the Estate, as the Court must, the Estate's proposed slander of title claim is futile. This is so because the Estate has failed to state any facts to plausibly support a claim for special damages. The proposed Amended Counterclaim plainly recounts the allegation that McKesson included the superfluous restrictions in the deed, without explaining how the restrictions caused the Estate any damage, other than that it generally "put a cloud on the title," (Doc. 47-1, p. 17), and "placed a burden and restriction on the lands improperly included." (Doc. 47-1, p. 21). In other words, the Estate does no more than presume damages "from the nature of the defamation." 331 Ark. at 368. Absent any plausible allegation of special damages, this Court would dismiss the Estate's claim on a motion to dismiss, rendering the proposed amendment futile.

### C. The Estate's Proposed Claim That Section 9.2 is Unconscionable is Futile

Section 9.2 of the Settlement Agreement declares, in pertinent part, that the Ormond Group "shall cooperate with MMI . . . by, among other things . . . not conferring with regulatory agencies . . . without MMI's prior written consent." (Doc. 19-1, p. 11). The Estate argues that the clause is "so unfair and one-sided that it is unconscionable," and asks the Court to declare it as so. (Doc. 47-1, p. 22). In determining whether a provision of a contract is unconscionable, courts look to whether the provision is both procedurally and substantively unconscionable. "Procedural unconscionability deals with the manner in which a contract was entered into; substantive unconscionability, on the other hand, looks to the terms of the contract and whether they are harsh, one-

sided, or oppressive." *Jarrett v. Panasonic Corp. of N. Am.*, 8 F. Supp. 3d 1074, 1082 (E.D. Ark. 2013) (citation omitted). A plaintiff must prove both elements to sustain an unconscionability claim. *Id.*

With respect to procedural unconscionability, it "encompasses contracts where there is an absence of meaningful choice on the part of one of the parties together with contract terms that are unreasonably favorable to the other party." *LegalZoom.com, Inc. v. McIllwain*, 2013 Ark. 370, at *7 (2013), *cert. denied*, 134 S.Ct. 1563 (2014). "Two important considerations are whether there is a gross inequality of bargaining power between the parties and whether the aggrieved party was made aware of and comprehended the provision in question." *Jordan v. Diamond Equip. & Supply Co.*, 362 Ark. 142, 156 (2005).

The Estate's proposed amendment does not plead facts plausibly showing that Section 9.2 is unconscionable. First, the contract itself declares that the parties have relied on the legal advice of their attorneys, that their attorneys have read and explained the contract to them, and that they understand and voluntarily accept the terms of the contract. Second, there was no gross inequality of bargaining power. The parties each faced an unknown amount of liability stemming from the Site cleanup, and had pending lawsuits against each other with respect to that issue. The Settlement Agreement was an arms-length deal between business actors seeking to settle two lawsuits and allocate expenses for a mutual liability. There is nothing procedurally unconscionable about it.

Moreover, the contract is not substantively unconscionable. In exchange for $200,000.00 and the responsibilities and restrictions imposed on the Ormond Group— including Section 9.2—MMI and McKesson released it from all future liabilities from

government actors related to the cleanup of the site. Since that time, MMI and McKesson have allegedly spent over $20,000,000.00 on the Site. The Estate offers no basis to plausibly conclude that the contract is "one-sided, or oppressive" given the costs incurred by MMI and McKesson in exchange for the Estate's compliance with that provision and others. *Jarrett*, 8 F. Supp at 1082.

For these reasons, the Estate's proposed claim that Section 9.2 is unconscionable is futile.

### D. The Estate's Proposed Claims Regarding Section 1(e)

The Estate proposes two new claims by which it seeks to invalidate Section 1(e) of the Site Agreement. This section bars the Ormond Group from selling, assigning, leasing, or conveying any Site property interests without McKesson's prior written consent while "environmental investigation, cleanup, post-cleanup monitoring, or any other regulatory requirement remains in connection with the Site." (Doc. 19-1, pp. 23-24). The Estate's proposed amendments seek to invalidate this provision because the clause (i) violates public policy; and (ii) is unconscionable, because "it is an unreasonable and unnecessary restriction" on its property rights and ability to sell the property. (Doc. 47-1, p. 23).

### 1. The Estate's Proposed Unconscionability Claim is Futile

To quickly discard the second of these claims, Section 1(e) is not unconscionable for the same primary reason that Section 9.2 is not unconscionable: there is no procedural unconscionability. *See supra* Section I(C).

### 2. The Estate's Void-As-Against-Public-Policy Claim is Facially Plausible

Regarding its claim that the clause violates public policy, the Estate is in effect asserting that Section 1(e) imposes a direct restraint upon alienation of the Site in violation of public policy. There are three types of direct restraints:

> First, a disabling restraint is created when property is devised or conveyed with the limitation that it not be alienated. . . . Second, a forfeiture restraint is created when, by an instrument of transfer, the estate transferred will be subject to forfeiture or termination on alienation. . . . Third, a promissory restraint is created when the promisor agrees, in a covenant in an instrument of conveyance, or by contract, not to alienate the property.

*Broach v. City of Hampton*, 283 Ark. 496, 500 (1984) (internal citations omitted). The restraint imposed upon the Estate is of the third variety, a promissory restraint. "Restraints on alienation may be upheld if they are a reasonable means of accomplishing a legal and useful purpose." *Casey v. Casey*, 287 Ark. 395, 398 (1985). Promissory restraints are valid only if "the restraint is qualified so as to permit alienation to some though not all possible alienees" and "the restraint is reasonable under the circumstances." *Id.* at 399 (quoting 4 Restatement of Property § 406 (1944)). Further, "to uphold restraints on the alienation of such estates it must appear that the objective sought to be accomplished by the imposition of the restraint is of sufficient social importance to outweigh the evils which flow from interfering with the power of alienation or that the curtailment of the power of alienation is so slight that no social danger is involved." *Id.* (quoting 4 Restatement of Property § 406 cmt. a (1944)).

> When present, the following factors support the conclusion that a restraint is unreasonable:
>
> 1. the restraint is capricious;
> 2. the restraint is imposed for spite or malice;

3. the one imposing the restraint has no interest in land that is benefited by the enforcement of the restraint;
4. the restraint is unlimited in duration;
5. the number of persons to whom alienation is prohibited is large.

*Id.* (quoting 4 Restatement of Property § 406 cmt. i (1944)).

Several of the factors are implicated here, and so the Court finds that the Estate's proposed Second Amended Complaint states facts plausibly alleging that Section 1(e) of the Site Agreement violates public policy as an unreasonable restraint on alienation. Viewing the facts in the light most favorable to the Estate, the restraint could last "possibly hundreds of years," making the restraint, in essence, unlimited in duration. (Doc. 35, p. 14). Second, the number of persons to whom the alienation is prohibited is potentially large. Section 1(e) prohibits the Estate from alienating its property without McKesson's prior written consent. McKesson has indicated that it would not release the Estate from its contractual restrictions "without a serious amount of insurance, bonding or other financial instrument in place to offset the anticipated environmental obstacles at this site." (Doc. 35, p. 12). Construed in the light most favorable to the Estate, McKesson's restrictions effectively prevent a sale to anyone, which suggests that the scope of the restraint is prohibitively large. Finally, viewed in the light most favorable to the Estate, the restraint has little useful purpose. *See Casey*, 287 Ark. at 398. The Site Agreement applies to "the successors and assigns of the parties." (Doc. 19-1, p. 24). The Settlement Agreement contains an identical clause. (Doc. 19-1, p. 12). It follows that any contractual obligation owed to McKesson by the Estate would also apply to a party purchasing its interest in the Site, so to further require McKesson's written consent to sell is arguably capricious.

13

For these reasons, the Estate's proposed public policy claim related to Section 1(e) of the Site Agreement is facially plausible. The Court will **GRANT** the Estate leave to supplement its First Amended Complaint, adding the public policy claim related to Section 1(e) of the Site Agreement.

### E.  The Estate's Constitutional Claims

The Estate seeks leave to amend to remove its constitutional claims, which fail because they do not allege any state action. Rather than granting the Estate leave to amend for this purpose, the Court chooses to dismiss its constitutional claims *infra* in Section II(B).

### F.  The Estate's Other Proposed Amendments

The Estate's proposed Second Amended Answer and Counterclaim also adds several factual allegations related to its breach of contract claim and its request for a declaration that Section 9.2 violates public policy. The Court does not find these additional facts helpful in adjudicating either claim, and therefore, denies the Estate's Motion to File to add those—and any other—amendments.[3]

### II.  McKesson's Motion to Dismiss

Having denied the Estate leave to amend, except with respect to its public policy claim related to Section 1(e) of the Site Agreement, the Court now turns to McKesson's Motion to Dismiss the Estate's counterclaims for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss pursuant to Rule 12(b)(6), the complaint must present "a short and plain statement of the claim

---

[3] The Estate also seeks to amend Paragraphs 37 and 100 of its Answer. Its proposed amendment to Paragraph 37 immaterially alters what the Estate admits and denies in McKesson's corresponding Paragraph 37. Its proposed amendment to Paragraph 100 adds three affirmative defenses which are all mooted by this Order.

that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The intention of this is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555). In evaluating the sufficiency of the complaint, the Court assumes that "all factual allegations in the pleadings are true and interpret[s] them in the light most favorable to the nonmoving party." *Bell*, 716 F.3d at 1091 (internal quotation omitted).

Even so, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). In short, "the pleading standard that Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). When considering a motion to dismiss, the Court ordinarily does not consider matters outside the pleadings, Fed. R. Civ. P. 12(d), but may consider exhibits attached to the complaint and documents that are necessarily embraced by the pleadings. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

## A.  The Estate's Breach of Contract Claim

In its 30-paragraph Count I, the Estate argues that McKesson breached the Settlement Agreement by (i) purposefully preventing the Arkwood site from ever being rehabilitated; (ii) interfering with the Estate's rights in adjacent lands; (iii) violating the duty of good faith and fair dealing; (iv) preventing the Estate from being able to use or sell the land; (v) denying or restricting the Estate from accessing the land; and (vi) using the property to store boats.

The Estate, however, fails to point to any specific term, phrase, or clause within the Settlement Agreement that McKesson allegedly breached. Instead, it asserts that McKesson violated the "primary purpose and intent of the Settlement Agreement" which was to "provide for the investigation, remediation and restoration of the Arkwood site" by not using its "best efforts" to remediate the site. (Doc. 25, pp. 2-3). The crux of the Estate's argument, in other words, is that McKesson is in breach of the Settlement Agreement because it is not remediating the Site at the pace that the Estate wants it to.

Rather than requiring McKesson to remediate the Site at any specific pace, the Site Agreement, referenced by Section 8 of the Settlement Agreement, grants it wide latitude to determine how the Site is remediated. Namely, it requires the Ormond Group to permit McKesson "to direct in its sole discretion the course of any investigation or cleanup [McKesson] deems appropriate or which is required." (Doc. 19-1, p. 24). It also prohibits the Ormond Group from interfering "with the activities of EPA or [McKesson] . . . in connection with the completion of a Remedial Investigation/Feasibility Study" and requires it to give McKesson "unconditional and unrestricted access for any purpose whatsoever" to the Site. *Id.* The only contractual limitation on McKesson's discretion is

that it use "best efforts not to act or fail to act with regard to the Site in a manner which would cause EPA, the Department of Justice or any other governmental entity . . . to attempt to levy or assess . . . a fine or penalty." (Doc. 19-1, p. 8).

This Court will not read into the contract a requirement that McKesson remediate the site "at the earliest possible opportunity" when the language of the contract so clearly gives McKesson discretion in the matter. (Doc. 35, p. 10). A court "must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain, ordinary meaning" and where that meaning is unambiguous, it "is conclusive as to the intention of the parties." *Farm Bureau Mut. Ins. Co. of Ark., Inc. v. Milburn*, 269 Ark. 384, 386 (1980); *Lee Wilson & Co. v. Fleming*, 156 S.W.2d 893, 894 (1941).

Similarly, the other more peripheral claims levied by the Estate in Count I fail to plausibly allege that McKesson violated the Settlement Agreement. First, the Estate's claim that McKesson's imposition of land-access restrictions on the Estate constitutes a breach of contract is incorrect. The Estate cannot point to any provision giving it a contractual right to access the land, because none exist. Whatever access rights it does have do not come from the Settlement and Site Agreements; if anything, those Agreements provide *limitations* to the Estate's access rights. (Doc. 19-1, pp. 10, 24). Accordingly, the Estate fails to allege facts plausibly showing that McKesson breached the Settlement or Site Agreement by restricting its access to the land.

Second, the Estate's allegations that McKesson breached the contract by slandering its title and interfering with its rights in adjacent land are similarly erroneous. Once again, these allegations concern matters beyond the scope of the contract: even

assuming the underlying facts of these claims, they do not constitute a breach of either the Settlement or Site Agreement.

Third, McKesson's use of the property to store boats is not a breach of contract. As mentioned above, the Site Agreement requires the Ormond Group to give McKesson "unconditional and unrestricted access [to the Site] *for any purpose whatsoever*. (Doc. 19-1, p. 24) (emphasis added).

In the end, the Estate's breach of contract claims are rooted in its somewhat understandable frustrations with being the owner of land over which it cannot effectively exercise control. But, the Estate contracted away to McKesson the control it now seeks to exercise, and it did so to avoid exposure to a liability that has cost McKesson over $20,000,000.00 to date. The Estate has not pled facts plausibly showing that McKesson has breached its contract with the Estate. The Estate's breach of contract claim is, therefore, **DISMISSED**.

### B.  The Estate's Claim that Section 9.2 is Unconstitutional

The Estate seeks a Declaration that Section 9.2 violates the First Amendment of the United States Constitution, and Article 2 §§ 2, 4, and 6 of the Arkansas Constitution. However, to raise a successful claim under those constitutional provisions, a party must allege state action. *See Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 566 (1995) ("[T]he guarantees of free speech and equal protection guard only against encroachment by the government and erect no shield against merely private conduct . . . .") (quotation and alteration omitted); *Brandt v. St. Vincent Infirmary*, 287 Ark. 431 (1985). The Estate does not plead facts plausibly alleging state action, as the Settlement Agreement is between private parties, and the Estate does not argue that

McKesson was acting on behalf of the state in an agency capacity or in any other capacity. The Estate's claim that Section 9.2 is unconstitutional is **DISMISSED**.

### C. The Estate's Public Policy Claim

Finally, the Estate seeks a Declaration that Section 9.2 of the Settlement Agreement, requiring the Estate to obtain McKesson's written consent before conferring with regulatory agencies, violates public policy, and is therefore void and unenforceable. This argument presents the interesting question of whether a contract requiring a party to obtain another's permission before conferring with regulatory agencies may violate the public policy of Arkansas or the United States. This appears to be an issue of first impression in the Eighth Circuit and, indeed, in the country.

Courts should exercise tremendous caution before declaring a provision of a contract to be void as against public policy. A court should only strike a contract as a violation of public policy if it is "injurious to the interests of the public, or contravenes some established interest of society or some public statute, or is against good morals, or tends to interfere with the public welfare." *Guar. Nat. Ins. Co. v. Denver Roller, Inc.*, 313 Ark. 128, 138 (1993). Because it is generally the province of the legislative branches of the state and federal governments to determine what the public policy is, a court's finding that a contractual provision violates public policy for one of the above listed reasons should be rooted in statutes or in the state or federal constitution. *See Wal-Mart Stores Inc. v. Baysinger*, 306 Ark. 239 (1991) ("The public policy of a state is found in its constitution and statutes."); *Muschany v. United States*, 324 U.S. 49, 66 (1945) ("[T]here must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to [public] policy."); *Sirman v. Sloss Realty Co.*,

129 S.W.2d 602, 606 (Ark. 1939) ("Public policy is a vague phantasmagoria of legal concepts, when an effort is made to give the term meaning aside from the consideration of Constitution and statutes.").

Recognizing the importance of grounding its argument in statute, the Estate points to the Arkansas Freedom of Information Act ("A-FOIA"), the Openness Promotes Effectiveness in Our National Government Act ("Openness Act"), the Administrative Procedure Act's ("APA") public notice and comment requirement, and Executive Order No. 13563, all as indicating that Section 9.2 violates public policy. The public policy theme common amongst these laws, highlighted by the Estate, is the preference for the free flow of information from the government to the public, and from the public to the government. Regarding the former, the A-FOIA declares that it is "vital in a democratic society that public business be performed in an open and public manner so that the electors shall be advised of the performance of public officials and of the decisions that are reached in public activity and in making public policy." Ark. Code Ann. § 25-19-102. Similarly, the Openness Act proclaims that "the American people firmly believe that our system of government must itself be governed by a presumption of openness." Pub. L. No. 110-175, 121 Stat. 2524 (2007). Regarding the flow of information from the public to the government, the APA requires agencies to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation," and to "give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553. Executive Order No. 13563 requires regulations to be based on "the open exchange of information and perspectives among State, local, and tribal officials, experts in the

relevant disciplines, affected stakeholders in the private sector, and the public as a whole."

Given this public policy commitment to the open flow of information between the government and the public, and in particular between regulatory agencies and interested parties, the Court finds that the Estate has plausibly alleged that at least certain applications of Section 9.2 violate public policy. The Court will therefore deny McKesson's Motion to dismiss this claim.

Specifically, the Estate has plausibly alleged that an application of Section 9.2 that would restrict regulatory agencies from obtaining information from the Ormond Group, or restrict the Ormond Group from providing information to such agencies, would violate public policy. Regulatory agencies oftentimes benefit from, and indeed are required to seek out, information from interested parties. *See* APA, 5 U.S.C. § 553 ("[T]he agency *shall give interested persons* an opportunity to participate in the rule making through submission of written *data, views, or arguments* with or without opportunity for oral presentation." (emphasis added)). This process exists not only for the benefit of the public, but also for the benefit of the agencies. Agencies often receive valuable information from the public and interested parties throughout the rulemaking process which leads them to make different, and presumably better, decisions than they otherwise would without that input. When an interested party's ability to share relevant information with a regulatory agency is restricted by another party—particularly one with potentially adverse interests—the regulatory agency's ability to make informed decisions suffers.

Indeed, in response to McKesson's request that it stop discussing the Site cleanup with Curt Grisham, the EPA noted that it "strives to respond to public inquiries concerning sites over which it exercises statutory authority" and "affords members of the public every opportunity to have input, ideally meaningful, into the Superfund decision-making process at sites in their communities." (Doc. 35-1, pp. 2-3). Further, viewing the facts in the light most favorable to the Estate, Curt Grisham's interactions with the EPA were initiated by the EPA, again evincing the importance of input from the interested parties to the Agency. *See* Doc. 35, p. 4.

Given all of this, the Estate has plausibly alleged that an application of Section 9.2 that prevents regulatory agencies from obtaining information from the Ormond Group, or prevents the Ormond Group from providing information to regulatory agencies, undermines the APA and public policy.

In addition, the Estate has plausibly alleged that an application of Section 9.2 that would restrict the Ormond Group from obtaining information from regulatory agencies would violate public policy. Applying Section 9.2 to restrict a person from obtaining information from a regulatory agency could undermine the Freedom of Information Acts and the Openness Act. These Acts are premised on the idea that the "effective functioning of a free government like ours depends largely on the force of an informed public opinion." Pub. L. 110-175, 121 Stat. 2524 (quoting *Barr v. Mateo*, 360 U.S. 564, 577 (1959) (J. Black, concurring)). "Such an informed understanding depends, of course, on the freedom people have to applaud or to criticize the way public employees do their jobs, from the least to the most important." 360 U.S. at 577. Accordingly, it is at

least plausible that a contract restricting a party from obtaining information from regulatory agencies would violate public policy.

Finally, it is important to state that the Ormond Group and the regulatory agencies are not the only parties potentially affected by the plausibly impermissible applications of Section 9.2 outlined above. The public, too, may be harmed. The public has an interest in ensuring that the EPA and ADEQ can obtain information from all interested and potentially knowledgeable parties before making decisions concerning the Site. This is particularly so in this case, involving environmentally contaminated land that, if properly remediated, has potential use to the community as an industrially zoned area.

To summarize: the Estate has plausibly alleged that an application of Section 9.2 that (i) restricts regulatory agencies from obtaining information from the Ormond Group; (ii) restricts the Ormond Group from providing information to regulatory agencies; or (iii) restricts the Ormond Group from obtaining information from regulatory agencies, violates public policy. [4]

For the reasons stated herein, McKesson's Motion to Dismiss the Estate's request for declaratory relief on the validity of Section 9.2 is, therefore, **DENIED**.

---

[4] This holding should not be interpreted as implying that Section 9.2 is facially void. There may be applications of Section 9.2 that do not violate public policy, including those discussed above, as the Court has only held that the Estate has *plausibly alleged* that certain applications of Section 9.2 would violate public policy.

### III. CONCLUSION

For the reasons set forth above, the Court will enter a separate Order today summarizing and effectuating the rulings described herein.

**IT IS SO ORDERED** on this 17th day of December, 2015.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE